778 A.2d 364

## REGISTER OF WILLS FOR BALTIMORE COUNTY

v.

## Jeffrey A. ARROWSMITH, et al.

No. 122, Sept. Term, 2000.

Court of Appeals of Maryland.

Aug. 15, 2001.

Julia M. Andrew, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of Md., on brief), Baltimore, for Appellant.

Kurt J. Fisher (Sandra P. Gohn, Kenneth S. Aneckstein of Piper, Marbury, Rudnick & Wolfe, L.L.P., on brief), Baltimore, for Appellees.

D. Robert Enten, Gordon, Feinblatt, Rothman, Hoffberger & Hollander, L.L.C., Baltimore, on brief of the Maryland Bankers Ass'n, Inc. as Amicus Curiae in support of Appellees.

Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

BATTAGLIA, Judge.

We issued a writ of certiorari in this case to determine whether Maryland's statute of limitations with respect to filing a claim for refund of inheritance taxes was rendered inapplicable by the Treaty ratified pursuant to the Convention Between the United States of America and the Federal Republic of Germany for the Avoidance of Double Taxation with Respect to Taxes on Estates, Inheritance, and Gifts.[1]

## I. BACKGROUND

### A. Facts

This controversy arose in connection with the estate of Harold Arrowsmith (hereinafter "decedent"), who died intestate in Germany on August 15, 1989. The decedent was born, raised, and educated in Baltimore, Maryland and received a degree from the Johns Hopkins University in 1950. The decedent continued to live in Maryland until 1974 when he sold his house and put his furniture in storage. He briefly resided in an apartment-hotel in Washington, D.C., but moved to Germany in 1975. Although the decedent remained a U.S.

---

1. *See* T.I.A.S. No. 11082. Pursuant to Public Law 89–497, approved July 8, 1966 (80 Stat. 271; 1 U.S.C. 113), "... the Treaties and Other International Acts Series issued under the authority of the Secretary of State shall be competent evidence ... of the treaties, international agreements other than treaties, and proclamations by the President of such treaties and international agreements other than treaties, ... in all the courts of law and equity and of maritime jurisdiction, and in all the tribunals and public offices of the United States, and of the several States, without any further proof or authentications thereof."

citizen his entire life, filed U.S. income tax returns, and maintained a Maryland driver's license, he returned only occasionally to the United States to present the results of his research and writings.

The decedent's assets in Maryland consisted almost entirely of intangible personal property, specifically publicly-traded securities worth nearly $30 million, held at the Mercantile Safe Deposit and Trust Company.[2] The decedent's heirs [3] initially filed a petition for probate in Baltimore County in September 1989, asserting that because "the decedent was domiciled in Maryland and a majority of his assets are located in this state," the Register of Wills for Baltimore County (hereinafter "the Register") was the proper office in which to file the petition.[4] On May 14, 1990, the appellees paid $2,000,000 to the Register in inheritance taxes.[5] About that time, the estate

---

2. The inventory of appraisal filed with the Petition for Probate before the Register of Wills for Baltimore County summarized the property as follows: $20,937,427.50 in corporate stocks, $9,412,851.37 in bonds, notes, mortgages, and debts due to the decedent, $739.06 in bank accounts, savings and loan accounts, and $24,884.26 categorized as "all other interests."

3. The decedent died intestate; his heirs-at-law were the children of his deceased brother: Edith Arrowsmith (now Edith A. Blackstone), Jeffrey A. Arrowsmith, and Stephen A. Arrowsmith (now deceased).

4. While the heir's motives, if any, in seeking to declare Maryland the domicile for purposes of paying inheritance and estate taxes may be legally irrelevant for purposes of resolving the issue before us today, it is interesting to note that contrary to the current position of the counsel for the appellee-heirs, the counsel originally, and fervently, insisted that Maryland was the domiciliary. In a "Petition for Allowance of Counsel Fees" filed with the Register on October 19, 1990, the heir's counsel asserted based on research and investigation, the decedent's domicile was Maryland, and noted that United States and Maryland taxes "are not only approximately 3% lower than German taxes, there effecting a savings of approximately $900,000, but United States law permit the use of alternative valuation in computing the federal tax and in this instance, savings of at least $1,000,000 were achieved as a result thereof. It is not believed that German law provides comparable relief."

5. The $2,000,000 payment was an advancement on the heirs' 10% collateral inheritance taxes under Maryland Code, § 7–204(b) of the Tax General Article (1988, 1997 Repl.Vol.).

also paid Maryland and Federal estate taxes, in the amount of $1,957,164 and $11,010,462, respectively.[6]

Concurrent with the administration of the decedent's estate in the United States, parallel probate proceedings were initiated in Germany. Unable to ascertain the decedent's heirs, the German tax authorities appointed a curator to administer his estate under German law. Concluding that at the time of his death the decedent was domiciled in Germany, the German tax authorities asserted that Germany was entitled to the inheritance taxes on his entire worldwide estate. The total German tax assessed was approximately $17,511,145. The German curator turned over all of the decedent's assets

---

6. In *Comptroller of the Treasury v. Jameson*, 332 Md. 723, 633 A.2d 93 (1993), Chief Judge Murphy eloquently explained the "complex interplay" between the Federal estate and the Maryland estate and inheritance taxes as follows:

"The United States imposes a federal estate tax which is payable nine months after death. On the federal estate tax return, estates are permitted to claim a credit, up to a specified amount, for state death taxes actually paid to any of the fifty states. This credit is a method of revenue sharing in which the federal government is diverting some federal estate tax revenue to the states.

The Maryland inheritance tax is a tax imposed on the privilege of receiving property ... the ultimate liability usually falls upon the beneficiary ... The inheritance tax is paid to the Register of Wills in the county where the court that administers the estate is located ... but the tax is not due until the property is distributed from the estate. The Maryland inheritance tax is not integrated with the federal estate tax; in other words, the calculation of the Maryland inheritance tax is not dependent upon the federal estate tax system in any way.

On the other hand, the Maryland estate tax is completely integrated with the federal estate tax. The structure of the Maryland estate tax is referred to as a 'pick-up' tax. This means that, if the federal credit for state death taxes allowable by the Internal Revenue Code exceeds the Maryland inheritance tax, an estate must pay Maryland estate tax to pick up the difference between the credit and the state inheritance tax. Stated more succinctly, the inheritance tax is deducted from the federal estate tax credit to determine the amount of Maryland estate tax. By providing for full use of the federal credit for state death taxes, the Maryland estate tax statute shifts taxes that would otherwise be paid to the federal government to the state treasury. In contrast to the Maryland inheritance tax, the executor pays the Maryland estate tax to the State Comptroller and pays the estate tax directly from the decedent's estate." Id. at 725–26, 633 A.2d at 94 (internal citations omitted).

located in Germany,[7] totaling $1,022,355, to the German tax authorities as partial payment of the assessed taxes, leaving an unpaid German inheritance tax balance of approximately $16,488,790, exclusive of interest and administrative penalties for failure to file timely returns or make timely payment.

To avoid being subjected to double taxation, and pursuant to the Convention between the United States of America and the Federal Republic of Germany for the Avoidance of Double Taxation with respect to Taxes on Estates, Inheritances and Gifts (the "Treaty"), the heirs sought relief from the Competent Authority of the United States (hereinafter, "CAUS")[8] in resolving the dispute as to which country death taxes should be requited. On November 9, 1995, the CAUS, agreeing with the position taken by the Competent Authority of Germany, (hereinafter, "CAG")[9] declared that the decedent was domiciled in Germany at the time of his death, and that therefore Germany had the primary right to tax the estate's worldwide assets under the Treaty.

Armed with the mutual agreement of the Competent Authorities, the heirs requested a refund of the federal estate taxes. Pursuant to the agreement, the United States Internal Revenue Service ("IRS") ultimately agreed to make the refund payable directly to the German government.

On November 9, 1998, three years after the determination of domicile by Mutual Agreement, the heirs filed for refunds of the Maryland estate and inheritance taxes. The Maryland

---

**7.** The only assets of the decedent located in Germany at the time of his death were the furnishings of his apartment and approximately $726,000 in German bank accounts. As he had earned no income in Germany at any time, this money represented the unspent remainder of his monthly remittances of $10,000 from his United States bank accounts.

**8.** Under terms of the Treaty, the Assistant Commissioner International of the Internal Revenue Service is designated the Competent Authority of the United States.

**9.** The German Competent Authority is the Federal Minister of Finance for Germany.

Comptroller of the Treasury granted the heirs' request for refund of the state estate tax in the amount of $1,717,578.61.[10] The Register, however, denied the request for refund because it was not filed within the statute of limitations prescribed by Tax–General Article 13–1104(a).[11] Because the Register's denial and the subsequent litigation was based on the statute of limitations, the Register never reached the merits of the appellees' claim, i.e. whether the heirs were entitled to a refund of the inheritance tax.

## B. The Treaty

A brief explanation of the objectives of the Convention Between the United States of American and the Federal Republic of Germany for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion, and the design of the resulting Estate and Gift Tax Treaty [hereinafter "Treaty"] is both prudent—as the decisions of the Maryland Tax Court and the Circuit Court for Baltimore County rest upon interpretations of this bilateral Treaty—and necessary to ensure

---

**10.** Appellees claim that because the Maryland Comptroller of Treasury refunded the state estate tax, the State effectively conceded that the Treaty applied to Maryland death taxes, and therefore they were entitled to a refund of the inheritance tax as well. As the issue of the refund of the Maryland estate tax is not presently before the Court, we shall refrain from opining on the wisdom and/or legality of the Comptroller's determination.

**11.** Maryland Code, § 13–1104(a) of the Tax General Article provides: "Except as otherwise provided in this section, a claim for refund under this article may not be filed after 3 years from the date the tax, interest, or penalty was paid." Until 1997, no other subsection of § 13–1104 applied to inheritance taxes. By Acts of 1997, *see* 1997 Md. Laws, ch. 546, § 13–1104(d), which originally provided that "[a] claim for refund of Maryland estate tax or Maryland generation-skipping transfer tax may not be filed after 3 years from the date of the event that caused the refund," was amended to include inheritance tax. The amendment, however, is only applicable to decedents dying on or after July 1, 1997. This distinction—"3 years from the date of the tax" and "3 years from the date of the event that caused the refund"—as applied to state inheritance and estate taxes respectively, was the basis for the disparity in outcomes with respect to the Comptroller's determination that a refund was proper in this case, and the Register's determination that a refund was improper. *See also supra* note 10.

the faithful comprehension of the Treaty provisions. The United States and Germany [hereinafter, collectively "the Contracting States"] entered into the Convention for the Avoidance of Double Taxation on December 3, 1980, and the resulting Treaty was ratified by the Senate on June 27, 1986. The express purpose of the Treaty was to prevent the double taxation of the estates of citizens or residents of the two countries. *See* Treaty, Preamble.

Double taxation arises because the definition of "domicile" differs in each country, making it possible for an individual to be deemed a domiciliary of both the United States and Germany. *See* REPORT OF THE SENATE COMMITTEE ON FOREIGN RELATIONS ON TREATY DOC. NO. 97–1 at 2, 97th Cong., 1st Sess. (Nov. 10, 1981) [hereinafter "SENATE TREATY DOC. NO. 97–1"]. An individual is considered domiciled in the United States if the person is "a resident or citizen thereof" and is considered domiciled in Germany if that person has a "domicile" or "habitual abode" there. *See* Treaty, Art. 4. Thus, in circumstances such as those before us today, a person can be a citizen of the United States but have an habitual abode in Germany, and each country could rightfully declare itself the domicile. The Treaty addresses this possibility by outlining a hierarchy of considerations which assist the nations in settling potential disputes as to which country has primary taxing authority on a decedent's estate. Because both the heirs and the Register have now stipulated that-under the terms of the Treaty—the decedent was domiciled in Germany at the time of his death, we will forego further discussion of these particular provisions.

The Treaty specifically discusses the taxable status of certain real or tangible properties, namely immovable property (Article 5), business property of a permanent establishment (Article 6), ships and aircraft (Article 7), and interest in partnerships (Article 8). Because the disputed property involved .in the present case does not fall into any of these categories, we will avoid the exercise of such partitioning and simply refer to these properties in general terms, as "itemized property." When the property in dispute is not "itemized

property" under the Treaty, then, pursuant to Article 9, it is subject to taxation in the Contracting State in which the decedent is declared domiciled. *See* Treaty, Art. 9. Thus, as between the two countries, Germany had the primary right to tax the decedent's worldwide assets.

That Germany is declared the primary taxing jurisdiction, however, does not preclude the United States of America from taxing the estate in accordance with its laws. The authority granted to the "domiciliary" country in Article 9 is not exclusive. Article 9 is expressly limited by the provisions in Article 11, which devise a system of "credits" so that when both countries rightfully tax a decedent's estate, double taxation is avoided by requiring one country to provide a credit against the tax calculated in the other.[12] The Treaty details circumstances under which one country is obligated to furnish a credit against the tax calculated. Most pertinent to the case at hand, the Treaty explicitly provides that the credits allowed by Germany must include taxes levied by political subdivisions, e.g. Maryland. *See* Treaty, Art. 11(4). While the provision appears to ordain such a credit only with respect to "itemized property," [13] it is worthy of note that the Contract-

---

12. For example, Article 11, paragraph 3 provides that where Germany taxes the decedent's estate by reason of domicile and the United States, pursuant to the Treaty provisions, taxes the "itemized property," then Germany "shall credit against the tax calculated according to its law with respect to such property an amount equal to the tax paid to the United States ..." Treaty, Art. 11(3)(a). More generally, two scenarios were explicated by the drafters. First, where Country A imposes tax by reason of domicile (or citizenship) and Country B imposes tax on "itemized property" under the Treaty provisions, Country A must credit to the estate the tax paid to Country B. Second, where both Country A and B tax the property of an individual on a worldwide basis because he was a citizen of one country and a domiciliary of the other, the country of citizenship yields to the country of domicile and allows a credit for taxes paid to the country of domicile. *See* SENATE TREATY DOC. No. 97–1, at 11.

13. Article 11, paragraph 4 of the Treaty states that "[t]he credits allowed by the Federal Republic of Germany *according to the provisions of paragraph 3* shall include taxes levied by political subdivisions of the United States ..." The applicable provision of paragraph 3 only refers to the taxation of "itemized property" in the United States; therefore,

ing States were conscious of the taxing authority of political subdivisions at the time the Treaty was drafted. If any difficulties arise in applying the credit system, the Treaty requires resolution by the Competent Authorities under Article 13. *See* Treaty, Art. 11(5).

Under Article 13, the Competent Authorities of the Contracting States are given broad authority to resolve, by Mutual Agreement, "any difficulties or doubts" which arise when interpreting or applying the Treaty. *See* Treaty, Art. 13(3). The Competent Authorities may also consult for cases or circumstances not explicitly covered by the Treaty. *Id.* Therefore, any person, believing that the actions of the Contracting States result in double taxation, may present his or her case to the Competent Authorities for review and the Competent Authorities "shall endeavor . . . to resolve the case by mutual agreement." *See* Treaty, Art. 13(2). Finally, the Treaty provides that, "[i]n the event that the competent authorities reach such an agreement, taxes shall be imposed and, notwithstanding any procedural rule (including statutes of limitations) applicable under the law of either Contracting State, refund or credit of taxes shall be allowed . . ." *See* Treaty, Art. 13(5).

## C. Legal Proceedings

After the Register's denial of the refund request, the heirs noted a timely appeal to the Maryland Tax Court, presenting two issues for consideration by the Tax Court: whether the Treaty preempted the Maryland statute of limitations, and whether the heirs were entitled to a refund of the inheritance tax on the grounds that the Competent Authorities of the United States and Germany agreed that the decedent was not domiciled in the United States at the time of his death, and hence, according to appellees, no Maryland inheritance taxes were ever owed. The Tax Court affirmed the Register's

---

upon a strict reading of the text, we can only conclude that Germany is required to grant a credit to the estate when the tax paid to Maryland concerns the "itemized property" under the Treaty.

denial, concluding that the provisions of the Treaty are binding on the U.S. Government but not its political subdivisions, and therefore, does not apply to state inheritance taxes and statutes of limitations therein.

The heirs appealed to the Circuit Court for Baltimore County, Case No. 03–C–0–000273. The Circuit Court reversed the Tax Court and ruled that Article 13, paragraph 5 of the Treaty, which provides that "[i]n the event that the competent authorities reach such a [mutual] agreement, taxes shall be imposed and, notwithstanding any procedural rule (including statute of limitations) applicable under the law of either Contracting State, refund or credit of taxes shall be allowed by the Contracting States in accordance with such agreement," applies to political subdivisions of the United States as well. *See* Treaty, Art. 13. The Circuit Court maintained that "[s]ince the drafters recognized, in Article 11, that credits by Germany should be allowed for taxes paid into either our federal or state coffers, it necessarily follows that the Mutual Agreement Procedure in Article 13 was not intended to relate only to actions of the United States Government that result in double taxation." Concluding that the heirs could not avoid double taxation by obtaining an Article 11 credit from Germany because intangible assets were not specifically mentioned in the Article 11 credit system, the Circuit Court ordered the Register to approve the refund claim.

The Register appealed to the Court of Special Appeals, and we issued a writ of certiorari, on our own motion, to resolve this conflict.

## II. STANDARD OF REVIEW

■ Our review of an order by the Maryland Tax Court, an administrative agency, is "under no statutory constraints ... [when] a Tax Court order ... is premised solely upon an erroneous conclusion of law." *Supervisor of Assessments of Baltimore County v. Keeler*, 362 Md. 198, 207, 764 A.2d 821, 826 (2001)(quoting *Ramsay, Scarlett & Co. v. Comptroller of the Treasury*, 302 Md. 825, 834, 490 A.2d 1296, 1301 (1985));

*see* Maryland Code, § 13–532(a) of the Tax General Article (stating that "[a] final order of the Tax Court is subject to judicial review as provided for contested cases in §§ 10–222 and 10–223 of the State Government Article"). The Annotated Code of Maryland State Government Article instructs that a court may reverse administrative decisions where such a decision is affected by an error of law. *See* Maryland Code, § 10–222(h)(3)(iv) of the State Government Article (1984, 1999 Repl.Vol.).

■■■ Where the Tax Court's order is based on a factual determination, however, the reviewing court may reverse only if the findings and conclusions are unsupported by substantial evidence in the record. *See Comptroller of the Treasury v. Disclosure, Inc.* 340 Md. 675, 683, 667 A.2d 910, 914 (1995).

■■■ The interpretation of an international treaty and specifically, the treaty's application to conflicting state law, are inherently issues of law, and thus, as is consistent with our review for all questions of law, we review the order and judgment *de novo*. *See State Dep't of Assessments and Taxation v. Consumer Programs, Inc.,* 331 Md. 68, 72, 626 A.2d 360, 362 (1993) (stating that when an agency "erroneously determines or erroneously applies the law," a reviewing court is authorized to reverse that decision).

## III. DISCUSSION

### A. Plain Meaning Interpretation

■■■ As the "Constitution and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby . . ." there is no question that state courts are obligated to obey and respect treaties made under such authority. *See* U.S. CONST. art. VI, cl. 2. Similar to statutory interpretation cases, adherence to the text of a treaty is the primary objective in interpreting the rights and duties therein. *See Maximov v. United States,* 373

U.S. 49, 54, 83 S.Ct. 1054, 1057, 10 L.Ed.2d 184, 188 (1963)(construing a double taxation treaty with Great Britain and stating that "it is particularly inappropriate for a court to sanction a deviation from the clear import of a solemn treaty between this Nation and a foreign sovereign, when, as here, there is no indication that application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories"). The interpreter may look not only to the text of the treaty but to "the context in which the written words are used" to give sensible meaning to the treaty provisions. *See Air France v. Saks,* 470 U.S. 392, 397, 105 S.Ct. 1338, 1341, 84 L.Ed.2d 289, 295 (1985). In the case presently before us, the plain meaning of the Treaty text compels the conclusion that the Treaty acts as a limitation on federal taxing authorities and not on the states. Article 2 of the Treaty, entitled "Taxes Covered" expressly provides:

1. The existing taxes to which this Convention shall apply are:
 a) In the case of the United States of America: The *Federal* estate tax and the *Federal* gift tax, including the tax on generation-skipping transfers;
 b) In the case of the Federal Republic of Germany: the inheritance and gift tax.

*See* Treaty, Art. 2 (emphasis added).

Appellees argue that the scope of the Treaty must necessarily encompass state as well as federal taxes because viewed otherwise, the express purpose of the Treaty—to avoid double taxation—would be defeated. Presently limiting our review to the "plain language" of the Treaty, we find two problems with appellees' theory. First, the Treaty explicitly considers the potential for taxation by "political subdivisions" of the United States when discussing the credit system in Article 11, paragraph 4: "The credits allowed by the Federal Republic of Germany according to the provisions of paragraph 3 *shall include taxes levied by political subdivision of the United States of America.*" Treaty, Art. 11(4) (emphasis

added). Use of the term "political subdivision" demonstrates that the drafters were clearly cognizant of the double taxation issues that might arise as a result of estate taxation imposed during state probate proceedings. Had the drafters intended the Treaty to "necessarily" apply to state estate and inheritance taxes, there would be no need for a separate provision that unequivocally refers to the credits afforded for state taxation. Just as we reprehend rendering portions of statutes surplusage, *see e.g. Sinai Hospital of Baltimore, Inc. v. Dep't of Employment and Training,* 309 Md. 28, 39–40, 522 A.2d 382, 388 (1987), so too do we find it beyond our proper judicial capacity to render provisions of Federal treaties meaningless by an interpretation which would fail to give effect to all provisions absolutely. The Treaty, as viewed through the lenses of the appellees, would be riddled with redundancy: Paragraph (3) of Article 11 provides that Germany shall allow credit for taxes imposed by the United States on "itemized property." If taxes imposed "by the United States" necessarily encompassed taxes imposed by the political subdivisions, it would be senseless to include a distinct provision which directs Germany to allow credit for taxes levied by the political subdivisions on "itemized property" as well.

Second, the purpose of the Treaty is not eviscerated by virtue of state taxation of non—"itemized property"—e.g. the intangible assets taxed in this case.[14] In the event that a

14. We digress momentarily to address the arguments raised in the *Amicus Curiae* brief submitted by the Maryland Bankers Association (hereinafter "MBA") in support of appellees' position. The MBA believes that a decision in favor of the Register would improperly afford intangible assets held in a Maryland custodial account a taxable situs in Maryland for purposes of probate proceedings. The MBA warns that such a ruling would subject those who choose to invest in marketable securities through Maryland financial institutions to taxation by multiple jurisdictions, and thus would deter foreign and nonresident investors and put Maryland financial institutions at a competitive disadvantage.

While submitting a well-reasoned analysis of the potential problems with taxation of intangible property of nonresidents, the MBA raises an issue that is not presently before us. The issue is not whether the decedent's intangible assets were properly subject to Maryland inheri-

credit is not allowed by an express provision, the Treaty directs the Competent Authorities to consult for the purpose of avoiding double taxation. *See* Treaty, Art. 13(3). Contrary to what the appellees argue, the Treaty does not mandate that the political subdivisions forbear state probate proceedings in the event that a credit is not allowed; rather, the Treaty requires convergence of the Competent Authorities to endeavor to resolve these cases. *See* Treaty, Art. 13(3).

### B. Extratextual Materials: Report by the Senate Committee on Foreign Relations

█ The President has the "Power ... to make Treaties," U.S. CONST., art. II, § 2, cl.2, but in order for a treaty to become the supreme law of the land, it must receive the "Advice and Consent of the Senate ... provided two thirds of the Senators present concur." *Id.* The Senate may lawfully condition its advice and consent on the adoption of any number of reservations, declarations, or interpretations. *See United States v. Stuart,* 489 U.S. 353, 368, 109 S.Ct. 1183, 1192, 103 L.Ed.2d 388, 406 (1989); *see also* RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 313, comment (g) (1987). With respect to the Treaty under scrutiny today, the Senate Committee on Foreign Relations provided an express declaration of understanding that is supportive of this Court's conclusion.[15] In explaining Article 2 of

---

tance or estate taxes, but rather whether the Treaty prohibits Maryland from observing its established probate procedures, namely the statute of limitations. This case arrives before this Court having been litigated on the statute of limitations claim only. The appellees' primary argument is that the Treaty precludes Maryland from imposing its statute of limitations to bar a refund that appellees allegedly erroneously paid to the State. Appellees can only get to the secondary argument, i.e. that the intangible assets of their uncle cannot or should not be taxed under the probate laws of this State, if we find that their refund is not barred by the statute of limitations. Regardless, any determination as to the appropriateness of the imposition of the inheritance tax must first be addressed by the lower courts with fact-finding authority in these matters.

15. When presenting the Treaty to the Senate, the Committee on Foreign Relations reported favorably on the Treaty "without reservation but

the Treaty (the "Taxes Covered" provision), the Senate stated, "[a]s is generally true of other U.S. estate tax treaties, the proposed treaty *does not apply* to death or gift taxes imposed by state or local governments." *See* SENATE TREATY DOC. NO. 97–1, at 6 (emphasis added). The Senate continued, "[i]n determining the amount of credit to allow, Germany will allow a credit for taxes imposed by political subdivisions of the United States. Thus, although *state inheritance and gift taxes are not covered* by the proposed treaty, Germany has agreed to permit a credit against its taxes for state taxes." *Id.* at 12 (emphasis added). Thus, not only does a textual reading of the Treaty clearly indicate that it *exclusively* applies to Federal death taxes, but the Senate's express language, e.g. "the proposed treaty does not apply to ... taxes imposed by state or local governments," impedes the ability to put forth any rational challenge to such application.

## C. The Court of Appeals of Maryland

 Rarely has this Court had occasion to review the impact of international treaties on state probate matters. In fact, we must venture back to 1940, and prior to that, 1919, to reveal precedent which may provide a framework for our review today. On both of these occasions, we considered the effect of foreign treaties on state probate matters (namely, the appointment of administrators for estates of foreign citizens). In *Schneider v. Hawkins*, 179 Md. 21, 16 A.2d 861 (1940), we considered whether the Treaty of Friendship, Commerce and Consular Rights between the United States and Germany superseded the statutory law of Maryland by divesting the Orphans' Court of its discretion to appoint estate administrators. *Id.* at 24, 16 A.2d at 863. The Treaty in *Schneider* provided:

In case of the death of a national of either of the High Contracting Parties without will or testament, in the territo-

---

subject to an understanding" and recommended that the Senate give its advice and consent to ratification thereof. *See* SENATE TREATY DOC. NO. 97–1, at 1.

ry of the other High Contracting Party, the consular officer of the State of which the deceased was a national and within whose district the deceased made his home at the time of death, shall, so far as the laws of the country permit and pending the appointment of an administrator and until letters of administration have been granted, be deemed qualified to take charge of the property left by the decedent for the preservation and protection of the same. Such consular officer shall have the right to be appointed as administrator within the discretion of a tribunal or other agency controlling the administration of estates provided the laws of the place where the estate is administered so permit.

*Id.* at 25, 16 A.2d at 863–64 (quoting 44 Stat. 2132, 2153, art. 24). We interpreted this clause as retaining both the discretion of the Orphans' Court and the primacy of our state probate laws. *Id.* at 25, 16 A.2d at 864. The pertinent treaty provision in *Schneider* more clearly expressed the conditional nature of the foreign consul's authority as limited by the "laws of the place where the estate is administered," yet through *Schneider* our Court developed vital principles pertaining to the balance between deference to federal treaty-making authority and state authority in probate matters. In so doing, we referred to the Supreme Court of California's holding in a similar treaty interpretation case,

[t]he question presented is also of grave importance because its solution in favor of the [Consul General of Italy] necessarily ascribes to the federal government the intent, by means of its treaty-making power, to materially abridge the autonomy of the several states and to interfere with and direct the state tribunals in proceedings affecting private property within their jurisdictions. It is obvious that such intent is not to be lightly imputed to the federal government and that it cannot be allowed to exist *except where the language used in a treaty plainly expresses it, or necessarily implies it.*

*Id.* at 26–27, 16 A.2d at 864 (quoting In re *Ghio's Estate,* 157 Cal. 552, 108 P. 516, 523 (1910) (emphasis added)). In affirm-

ing the Supreme Court of California's judgment that the treaty did not supercede state probate proceedings, the United States Supreme Court stated, "... treaties ... are drawn by persons competent to express their meaning, ... to embody the purposes of the high contracting parties. Had it been the intention to commit the administration of estates ... exclusively to the consul of the foreign nation, it would have been very easy to have declared that purpose in unmistakable terms." *Rocca v. Thompson,* 223 U.S. 317, 332, 32 S.Ct. 207, 210, 56 L.Ed. 453, 458 (1912). While treaties, like contracts, are liberally construed to effectuate the ultimate purpose of contracting parties, the Supreme Court has recognized that probate proceedings in this country are matters primarily committed to state law and not so easily superceded. *See id.* at 329, 32 S.Ct. at 209, 56 L.Ed. at 457.

In a prior case involving a conflict between a foreign treaty and the administration of an estate under Maryland probate laws, Chief Judge Boyd, speaking for this Court in *Chryssikos v. Demarco,* 134 Md. 533, 539, 107 A. 358, 360 (1919), stated, "[i]t would not be just to assume that in making a treaty with a foreign country laws of the different States were intended to be repealed or ignored, in the absence of express language or clear implication showing such intent." The Treaty before us today neither expressly limits the authority of a state to issue estate and inheritance taxes, nor does the Treaty, by necessary implication, restrain a state from acting pursuant to its proper constitutional authority.

## D. Interpretation of Similar Estate Tax Treaties Between the United States and Other Countries

The Treaty between the United States and Germany is not unique. In fact, the United States is party to more than seventeen bilateral treaties, virtually identical in form and purpose.[16] While it does not appear that other state courts

16. The United States is party to bilateral Estate and Gift Tax Treaties with the following countries: Australia, T.I.A.S. No. 2903 (January, 7, 1954); Austria, T.I.A.S. No. 10570 (July 1, 1983); Canada, T.I.A.S. No.

have had the opportunity to review the Treaty before us today, similar estate tax treaties have been considered by state courts and held not to apply to taxes imposed by state governments. In *In re Ward,* 168 Mont. 396, 543 P.2d 382 (1975), the Supreme Court of Montana reviewed a treaty between the United States and United Kingdom constructed for the "avoidance of double taxation and the prevention of fiscal evasion with respect to taxes on the estates of deceased persons." *Id.* at 385 (quoting 60 Stat. 1391). The question before the Montana Supreme Court was whether Montana had jurisdiction to levy an inheritance tax on English trust property under the provisions of the tax treaty. *Id.* at 384. The Montana court held that the tax treaty had no application to its state inheritance taxes. *Id.* In so holding, the court relied on the express language of the U.S.—U.K. Treaty which, similar to the U.S.-Germany Treaty presently in dispute, provided that the taxes subject to the treaty are, "[i]n the United States, the Federal estate tax. . . ." *Id.* at 385 (quoting The Convention Between the United States of America and the United Kingdom for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion, Article I, Sec. 1). The Montana court also referred to regulations adopted by the Department of Treasury when implementing the treaty which stated that "the provisions . . . do not comprehend any of the estate, inheritance, legacy, and succession taxes imposed by the States, Territories, the District of Columbia, and possessions of the United States . . ." *Id.* (quoting Treasury Dept.

989 (14 June 1941), amended November 21,1951, T.I.A.S. No. 2348, Canada (2nd Treaty) 1 Jan. 1959 T.I.A.S. No. 4995 (January 1, 1959), protocol November 9, 1995, T.I.A.S. No. 11087; Denmark, T.I.A.S. No. 11089 (November 7, 1984); Finland, T.I.A.S. No. 2595 (December 18, 1952); France, T.I.A.S. No. 9812 (October 1, 1980); Germany, T.I.A.S. No. 11082 (June 27, 1986); Greece, T.I.A.S. No. 2901 (December 30, 1953); Ireland, T.I.A.S. No. 2355 (December 20, 1951); Italy, T.I.A.S. No. 3678 (October 26, 1956); Japan, T.I.A.S. No. 3175 (April 1, 1955); Netherlands, T.I.A.S. No. 7061 (February, 3, 1971); Norway, T.I.A.S. No. 2358 (December 11, 1951); Sweden, T.I.A.S. No. 10826 (June 13, 1983); Switzerland, T.I.A.S. No. 2533 (September 17, 1952); Union of S. Africa, T.I.A.S. No. 2509 (July 15, 1952); United Kingdom, T.I.A.S. No. 9580 (November 11, 1979).

Regulations, Sec. 82–102), language which is strikingly similar to the Senate declarations with respect to the U.S.-Germany Treaty presently before this Court.

The United States District Court for the Northern District of Indiana also had the opportunity to review a United States Canada Estate Tax Treaty upon a claim by plaintiff that he was entitled to receive a credit from the United States government for a tax paid to a political subdivision of Canada, an inverse of the claim presented today. *See Borne v. United States,* 577 F.Supp. 115 (N.D.Ind.1983). Again, the United States Canada Treaty limited the scope of the taxes covered to "for the United States of America: the Federal estate tax . . ." *Id.* at 116 (quoting Article I of the United States Canada Estate Tax Treaty). The District Court concluded, without reservation, that the Estate Tax Treaty applied "only to those taxes imposed by the respective governments and not to taxes imposed by political subdivisions of those respective governments." *Id.* In concluding as such, the District Court referred to the Senate Committee Report, which, like the Report produced for the U.S.-Germany Estate Tax Treaty, explained the U.S.-Canada Estate Tax Treaty provisions and the intended taxes to be included:

> This Convention is *similar to all of the other death tax conventions to which the United States is a party insofar as it does not apply to taxes imposed by state and local governments* of the United States and is similar to all but two other death tax conventions (the conventions with Finland and Switzerland) in that it does not apply to taxes imposed by political subdivisions of the other country.

*Id.* at 117 (quoting Federal Estate and Gift Tax Reports, ¶ 22,567 at 22,542)(emphasis added). The court then discussed the credit system established by the U.S.-Canada Estate Tax Treaty with respect to taxation by political subdivisions, and ultimately concluded that the United States was not obligated to provide a credit for foreign tax paid. *Id.* The importance of the District Court's opinion lies not in its ultimate holding, but rather in its unequivocal determination that the treaty does not supercede the probate proceedings of the political subdivi-

sions of the contracting parties, except to the extent that a credit may be applied by the contracting parties themselves.

While we are one of a small number of courts to consider the impact of federal estate tax treaties on state probate proceedings, we are not the first. Given that the substance and purpose of these bilateral agreements are virtually identical, given that other bodies of authority, intimately involved in the making and implementation of these treaties (e.g. the Department of Treasury and the Senate Committee on Foreign Relations) have expressly asserted the inapplicability of the treaty provisions to state probate proceedings, and given the outcome of other similar judicial claims, we find significant support for our holding today that the United States Germany Estate Tax Treaty does not impose on Maryland any duty or obligation to alter its probate proceedings to accommodate the appellees. Furthermore, and most critical to our resolution, the terms of the Treaty are not inconsistent with State law.

### E. Satisfying the Treaty Objectives

We believe that the objectives of the Treaty—the avoidance of double taxation—can be met through the channels that the Treaty itself provides. The drafters of the Treaty, wisely cognizant that one document, negotiated between two nations, could not possibly cover all the instances in which double taxation might occur, established the Mutual Agreement process to resolve unforeseeable disputes. The Treaty explicitly states that the Competent Authorities "may consult together for the elimination of double taxation in cases not provided for in the Convention." Treaty, Art. 13(3). The Treaty again refers to the Mutual Agreement prospect when outlining the "credit" system. The provision mandates that Germany allow a "credit" for the taxation by "political subdivisions of the United States," with respect to "itemized property," property which presumably warranted specific mention because such items were the most common sources of double taxation. Yet, when property falls outside of this category, and a perfunctory credit is not allowable, the Treaty provides that "the compe-

tent authorities may consult for the purpose of avoiding double taxation." *See* Treaty, Art. 11(4).

Appellees were clearly aware of the channels provided to them by the Treaty; they requested a determination, via Mutual Agreement, from the CAUS, as to the proper domicile of the decedent under the terms of the Treaty. Now, appellees would like to claim that the resolution of their request for declaration of domicile also impliedly included a resolution of the double taxation of their uncle's intangible assets which resulted from Maryland's imposition of inheritance and estate taxes.

A careful review of the record reveals the baseless nature of such a claim. The appellee's request to the IRS stated that the heirs "request the assistance of the competent authority in the determination of the *proper country* to which death taxes are due . . ." (emphasis added) and continues, "[t]he central issue involves which of the Contracting States to the Convention, the *United States or Germany,* is entitled to assess (and collect) death taxes," (emphasis added). Clearly, the appellees' request was pursuant to the Competent Authority's power under Article IV(5)—to determine the proper domicile and primary taxing jurisdiction—and not under Article XI(4)—to resolve double taxation problems that the "credit" system, itself, cannot correct. The U.S. Competent Authority, in agreement with the German Competent Authority, responded that the decedent was domiciled in Germany at the time of his death, and thus Germany had the "primary right to tax" the decedent's assets, but did not consider, nor was it asked to consider, whether there existed a means of remedying the double taxation of the decedent's intangible assets.

## F. The "Procedural Rule" Provision

[11] Appellees argue that even if the Treaty itself does not impede the imposition of state inheritance or estate taxes, it does prohibit the State from enforcing a procedural rule, i.e. the statute of limitations on refunds of inheritance taxes, which would defeat a party's relief from double taxation under

the Treaty. Appellees refer to Treaty Article 13(5) which provides: "[i]n the event that the competent authorities reach such an agreement taxes shall be imposed and, notwithstanding any procedural rule (including statutes of limitations) applicable *under the law of either Contracting State,* refund or credit of taxes shall be allowed by the Contracting States in accordance with such agreement." *See* Treaty, Art. 13(5) (emphasis added). Appellees hinge their argument on the phrase—"law of the Contracting State"—and insist that this phrase must include the laws of the political subdivisions of the United States. Appellees' claim is without merit.

 First, the phrase "law of *either* Contracting State," on its face refers to the laws of *either* the United States or Germany, not the laws of the political subdivisions collectively.[17] The Senate Committee's explanation of this provision

---

17. Appellees argue that this Court should interpret the phrase "law of either Contracting State" in this Treaty as the Supreme Court has interpreted the similar phrase "laws of both countries" contained in various extradition treaties, i.e. that state criminal laws should be considered in extradition matters. *See Wright v. Henkel,* 190 U.S. 40, 23 S.Ct. 781, 47 L.Ed. 948 (1903). A closer look at the reasoning behind the Supreme Court's holding in *Wright,* however, demonstrates the fallibility of applying this reasoning to probate matters. In *Wright,* the Supreme Court considered whether a citizen of the United States, who committed the crime of fraud (by bailee, banker, agent, factor, trustee, or director, or member or officer of any company) in London could escape being extradited to London for criminal proceedings because the United States did not so define the crime, even though the State of New York, the place to which the accused fled, did have such a crime. *Id.* at 58, 23 S.Ct. at 785, 47 L.Ed. at 954. The Supreme Court found that determining whether an act was deemed criminal in both countries required review of the criminal laws in the jurisdiction to which the person fled, i.e. the state, because the states were primarily responsible for defining and enforcing the criminal laws of this country. The Court opined,

"is the language of the treaty, 'made criminal by the laws of both countries,' to be interpreted as limiting its scope to acts of Congress, and eliminating the operation of the laws of the States? That view would largely defeat the object of our extradition treaties by ignoring the fact that for nearly all crimes and misdemeanors the laws of the States, and not the enactments of Congress, must be looked to for the definition of the offence. There are no common law crimes of the United States, and, indeed, in most of the States the criminal law has

**Note 17—Cont'd**

been recast in statutes, the common law being resorted to in aid of definition."

*Id.* at 58–59, 23 S.Ct. at 785, 47 L.Ed. at 954. As the Supreme Court points out, when this case was decided nearly a century ago, federal criminal law did not encompass every crime for which a person could be charged, requiring supplementation by the criminal laws of the states to assist in effectuating the purpose of extradition treaties: to provide for cooperation between nations in the repression of crime.

Two items distinguish the Supreme Court's holding in *Wright* as it applies to extradition treaties. First, the very act of fleeing the jurisdiction of a state to avoid prosecution, creates an interstate concern, as is evidenced by the Fugitives from Justice Act, codified at 18 U.S.C. § 1073, which designates the act of fleeing a jurisdiction a Federal crime. Congress has imposed no such laws with respect to double taxation by two states, and in fact, the Supreme Court has upheld the right of a state to impose death taxes on intangible personal property located in the state even when the same property is being subjected to death taxes in the state of the decedent's domicile at the time of death. *See State Tax Commission of Utah v. Aldrich,* 316 U.S. 174, 62 S.Ct. 1008, 86 L.Ed. 1358 (1942); *Curry v. McCanless,* 307 U.S. 357, 59 S.Ct. 900, 83 L.Ed. 1339 (1939). In extradition matters, or generally speaking, matters concerning fleeing felons, Congress has affirmatively established that a criminal's crossing of state lines to avoid prosecution is sufficient for Federal involvement. On the contrary, when two states tax a decedent's estate, relief from the resulting double taxation is solely a matter of state legislation. For example, Maryland, as do many states, provides a statutory exemption, which applies to the personal property of non-residents so long as the state or country of the decedent's resident affords a reciprocal benefit for Maryland residents who own intangible personal property located in that state or country. *See* Maryland Code, § 7–203(f) of the Tax General Article, which provides an exemption for nonresident decedent personal property, as follows:

(1) Except as provided in paragraph (2) of this subsection, the inheritance tax does not apply to the receipt of personal property that passes from a nonresident decedent if, at the time of death, the decedent is a resident of a state or foreign country whose law, on the date of the decedent's death:

(i) does not impose death taxes on the receipt of similar personal property of a resident of this State; or

(ii) contains a reciprocal exemption from death taxes similar to the exemption allowed under this subsection.

(2) The exemption under paragraph (1) of this subsection does not include the receipt of tangible personal property that has a taxable situs in this State.

Second, as discussed *supra,* the most significant basis for the Supreme Court's holding in *Wright* was that extradition treaties (prior to 18 U.S.C. § 1073), generally, did not provide this discretionary avenue—extradition was approved or disapproved based on the "general principle of international law ... that ... the act done on account of which extradition is demanded must be considered a crime by both parties ..." 190 U.S. at 58, 23 S.Ct. at 785, 47 L.Ed. at 954. Therefore, the purpose of the extradition treaties could not be fully realized

discusses the statute of limitations under the Internal Revenue Code but does not discuss or even imply that the provision was intended to encompass the statutes of limitations under the laws of the political subdivisions of the United States.[18]

 While treaties should be construed to further the purposes and objectives sought by the contracting parties, such an interpretation should not result in internal inconsistencies. *See e.g. Williams v. State*, 329 Md. 1, 15–16, 616 A.2d 1275, 1282 (1992)(stating that the court must discern "legislative intent from the entire statutory scheme, as opposed to scrutinizing parts of a statute in isolation"); *Calhoun v. State*, 46 Md.App. 478, 488, 418 A.2d 1241, 1248 (1980), *aff'd*, 290 Md. 1, 425 A.2d 1361 (1981) (stating that "internal consistency between the various provisions of a statute must be maintained, and subsections must, therefore, be interpreted in the context of the entire statutory scheme"). Used in several other portions of the Treaty, the phrase "law of the Contracting State," if interpreted to include the laws of each political

---

**Note 17**—Cont'd
without considering the criminal laws of the states. On the contrary, the Treaty under review today provides specific mechanisms for relief in the event that double taxation occurs, and if the Treaty provisions themselves do not provide relief, then the Treaty allows for requests to be made by the aggrieved party for resolution by mutual agreement between the two nations. For these reasons, we find the appellees' argument without merit.

**18.** The Senate Committee Report states, in pertinent part,
"[u]nder the Internal Revenue Code, a claim for credit or refund of U.S. estate and gift taxes generally must be made within three years from the date the return was filed. The proposed treaty provides a period of limitation during which claims for credit or refund of taxes based on the provisions of the treaty may be made which, in some cases, may be longer than that allowed by the Internal Revenue Code. It is provided that a claim for a credit or refund of taxes based on the provisions of the treaty must be made within one year from the final determination and payment of a tax for which a credit is claimed under the treaty (provided the determination and a payment occur within ten years from the date of the decedent's death or the date of the gift). The competent authorities may extend the ten year limitation if circumstances beyond the taxpayer's control prevented the determination of the tax within that ten year period."
SENATE TREATY DOC. No. 97–1 at 12.

subdivision, would create discontinuity in other provisions.[19] Furthermore, logic dictates that a treaty, which does not apply to state death taxes, should not apply to the "procedural rules" surrounding the collection of state death taxes.

Second, the phrase on which the appellees base their argument—"law of the Contracting States"—must be read in its proper context, i.e. by reading the provision in its entirety. In so doing, we see that regardless of whether the laws of the political subdivisions are necessarily included in the phrase "law of the Contracting States," the requested refund must be granted in accordance with a Mutual Agreement *and* it must be granted by a Contracting State.

The provisions of Article 13 deal strictly with the Mutual Agreement Procedure, a procedure of which the appellees have chosen not to avail themselves with respect to this particular claim. As was discussed, *supra* Section E of this opinion, the only Mutual Agreement produced in this case was the agreement between the Competent Authorities as to the primary taxing jurisdiction of the decedent's estate.[20] The appellees, pursuant to the Treaty, could have presented their claim to the CAUS for review and for "elimination of double taxation in cases not provided for in the Convention," namely

---

19. For example, according to Article 3, any term not defined in the Treaty shall "have the meaning which it has under the *law of that Contracting State* concerning the taxes to which the Convention applies." If each political subdivision were to define a Treaty term under its own laws, consistency in application of the Treaty provisions may be sacrificed and thus a significant basis for of participating in such a treaty, i.e., to clarify the estate taxation process, would be thwarted. Furthermore, according to Article 4(5), the determination of "whether a person other than an individual was domiciled in a Contracting State shall be determined according to the *law of that [Contracting] State.*" Certainly the contracting parties did not intend to allow a state to "weigh in" in the determination of domicile for "a person other than an individual" with respect to the resolution of which country had the primary taxing authority under the Treaty.

20. Appellees concede that the only issue they presented to the Internal Revenue Service in their request of assistance dated July 11, 1994, was for a determination as to the *primary* taxing jurisdiction for the decedent's estate. The IRS Response did nothing more than declare Germany the primary, *not exclusive,* taxing jurisdiction.

the taxes paid to the State of Maryland. *See* Treaty Art. 13(3). The inherent inconsistencies that would follow from adopting the interpretation sought by appellees are apparent: A refund, according to Article 13, must be "in accordance with such agreement;" thus, in order to prevail, the appellees would need to come before this State with a Mutual Agreement declaring, as its resolution to the double taxation problem, that Maryland refund the state inheritance tax. Notwithstanding that CAUS lacks such extensive authority under the Treaty, and is impliedly prohibited from exercising such authority under the Senate Committee's terms of ratification, *see* SENATE TREATY DOC. NO. 97–1 at 12, 13, the appellees have not appeared before this Court with such a Mutual Agreement. To grant the relief which appellees seek, not only must this Court unnecessarily dispense with application of state probate laws, but we must feign that appellees have appeared before us with the requisite resolution from the CAUS, binding this State to that resolution.

Furthermore, the provision mandates that the refund "shall be allowed by the Contracting States." *See* Treaty, Art. 13(5). As Maryland is clearly not a "Contracting State," the refund provision was patently intended to bind only the United States and/or Germany.[21]

We must interpret our State laws and the provisions of the Treaty as a court of law, not as a court of equity. While we recognize the unfortunate result that may befall appellees, we will not subvert the clear intention of those who drafted and ratified this Treaty on behalf of the United States, nor will we dismiss our Legislature's mandate in establishing guidelines for prompt and efficient administration of estates. The framers of the Treaty, seeking to avoid double taxation, outlined a method by which the primary taxing authority (as between Germany and the United States) could be determined. Then,

---

21. Presumably the refund that the United States granted the heirs pursuant to the Mutual Agreement that Germany was the primary taxing authority would fall under this provision of the Mutual Agreement Procedure Article.

pursuant to a system of credits, the Treaty permits taxation by other jurisdictions. And finally, the Treaty provides a forum for redress and resolution for any case not specifically covered within the four corners of the document. The Treaty itself provides meaningful mechanisms by which appellees can seek relief—and thus, the Treaty objectives can be accomplished by adherence to procedures established within the four corners of the document. The dissolution of our state laws is neither expressly nor impliedly required.

*JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY REVERSED. CASE REMANDED TO THE CIRCUIT COURT WITH DIRECTIONS TO AFFIRM THE DECISION OF THE MARYLAND TAX COURT. COSTS TO BE PAID BY THE APPELLEES.*