**In re Amako N.K. AHAGHOTU.**

**A Suspended Member of the Bar of the District of Columbia Court of Appeals (Bar Registration No. 352237).**

**No. 12–BG–1149.**

District of Columbia Court of Appeals.

Argued March 20, 2013.

Decided Sept. 12, 2013.

Melvin G. Bergman, Greenbelt, MD, for respondent.

Traci M. Tait, Assistant Bar Counsel, with whom Wallace E. Shipp, Jr., Bar Counsel, and Jennifer P. Lyman, Senior Assistant Bar Counsel, were on the brief, for the Office of Bar Counsel.

Before BECKWITH and EASTERLY, Associate Judges, and REID, Senior Judge.

BECKWITH, Associate Judge:

Respondent Amako N.K. Ahaghotu opposes the Board on Professional Responsibility's unanimous Report and Recommendation calling for his disbarment. Here this court confronts a set of undisputed facts branded differently by the Board and the Ad Hoc Hearing Committee, the latter of which previously received evidence in Mr. Ahaghotu's case and instead recommended a one-year suspension with a fitness requirement. Admitting that he violated the rule against misappropriation,[1] Rule of Professional Conduct 1.15(a), Mr. Ahaghotu challenges only the Board's conclusion that he acted recklessly—not negligently, as the Hearing Committee determined—in handling his client trust account. He also argues he should not be disbarred, even for reckless misappropriation.

We agree with the Board that the record shows Mr. Ahaghotu, beginning more than a year before the misappropriation, practically ignored obvious signals that his trust account had problems. Whether the problems were due to bank errors or flaws in his own accounting, Mr. Ahaghotu failed to take action to protect the money his clients entrusted him with, resulting in misappropriation. Although no one was harmed by his actions, Mr. Ahaghotu, who has been disciplined twice before in his career for how he handled entrusted funds, exhibited an "unacceptable level of disregard for the safety and welfare of entrusted funds"—that is, "a conscious indifference to the consequences of his behavior for the security of the funds." *In re Anderson*, 778 A.2d 330, 336, 339 (D.C. 2001) (citing *In re Micheel*, 610 A.2d 231, 236 (D.C.1992)). He thus committed reckless misappropriation, and we are bound by prior decisions of this court to disbar Mr. Ahaghotu absent "[o]nly ... the most stringent of extenuating circumstances." *In re Hewett*, 11 A.3d 279, 286 (D.C.2011) (quoting *In re Addams*, 579 A.2d 190, 193 (D.C.1990)). No extraordinary factors exist in Mr. Ahaghotu's case, and we therefore adopt the Board's recommendation of disbarment.

## I. Background

Mr. Ahaghotu[2] does not dispute the Hearing Committee's findings of fact, which the Board upheld almost entirely. He admits that Bar Counsel proved he misappropriated entrusted funds on July 28, 2005. That day, the balance in his Riggs Bank[3] trust account was $92.99, far less than the $1437.95 in insurance payouts he owed at the time to a medical provider, Dr. Chukwuemeka Onyewu, who cared for Blanca Adams, one of Mr. Ahaghotu's per-

---

1. Mr. Ahaghotu also does not challenge the Board's findings that he violated several other ethical rules in effect at the time of his misconduct: Rules of Professional Conduct 1.15(a) (commingling and failure to maintain adequate escrow records), 1.17(a) (improperly designated escrow account), and 1.15(b) and 1.3(c) (delayed disbursement of client funds); and D.C. Bar R. XI, § 19(f) (failure to maintain adequate financial records). Bar Counsel, meanwhile, does not challenge the Board and Hearing Committee findings that there was not clear and convincing evidence Mr. Ahaghotu violated Rules of Professional Con-

duct 8.4(c) and 8.1(a) (material misrepresentations to Bar Counsel).

2. A member of the D.C. Bar since 1981, Mr. Ahaghotu worked for the National Labor Relations Board until 1987 and then started a private personal injury firm, for which he was the sole principal at all times relevant to these proceedings.

3. In 2005, Riggs Bank became PNC Bank, which since then has held Mr. Ahaghotu's escrow and operating accounts.

sonal injury clients. The record shows that Mr. Ahaghotu was aware he owed the money to Dr. Onyewu.[4]

Although Bar Counsel alleged and proved just one instance of misappropriation—lasting only a day at that[5]—Bar Counsel argued, and the Board agreed, that Mr. Ahaghotu had acted recklessly in handling the entrusted doctor's fee. The misappropriation happened, in the Board's view, mainly because Mr. Ahaghotu ignored problems with his trust account that started a year before that. In June 2004, Mr. Ahaghotu wrote five checks on the trust account, totaling $6080, that were returned for insufficient funds, and at one point the account had a negative balance of $585.73. To refill his trust account and, in his words, to "protect the public," Mr. Ahaghotu deposited in the account nearly $20,000 in personal and operating funds.

Mr. Ahaghotu was the sole signatory on the account and at the time did not closely reconcile his records and bank statements. According to the Board, he "could not explain why there were insufficient funds to cover checks payable to various clients' medical providers, but testified he believed Riggs had failed to credit deposits he had made." Mr. Ahaghotu had no records to show the bank did anything wrong, however, and while he said he "tried to find out" what happened, he was unable to.[6] Mr. Ahaghotu testified that "many things could have happened [to explain] why this check was not paid. It could be that ... [t]he deposit had not cleared at the time it was presented ... [or] that the deposit itself was missing from my ledger...." He testified he was "surprise[d]" when the checks bounced "because I ... made my deposit and my own accounting said it should be paid," but he could not identify the funds actually used, once he had supplemented his account with his own funds and the checks cleared, to pay the medical providers. That is because, he said, he thought of his escrow account as "one account in which you put in several checks from several people.... Money come[s] from all the clients, and everybody takes his own from there."[7] This was not the first time that Mr. Ahaghotu's management of client funds came to the attention of Bar Counsel. He received informal admonitions in 1993 and 2009, each following a separate investigation of why he failed to pay a different medical provider after re-

4. Dr. Onyewu, a relative of Mr. Ahaghotu's wife, frequently treated respondent's clients. He had agreed as a favor to take a reduced fee in Ms. Adams's case and to defer being paid while Ms. Adams decided whether to "pursue the [personal injury] matter in court." Mr. Ahaghotu forgot to pay Dr. Onyewu, even after his client had decided not to sue, but Dr. Onyewu never requested that he be paid. Mr. Ahaghotu finally paid the doctor in September 2007, only after Bar Counsel contacted him and, as the Board put it, "sought proof of [r]espondent's disbursement of entrusted funds."

5. According to bank records, a day after Mr. Ahaghotu's trust account reached a low of $92.99, new deposits brought the balance to more than $17,000.

6. The record does not disclose a reason for the overdrafts, and Bar Counsel did not charge misappropriation for anything that happened with the trust account at that time. Despite the transfer of $20,000 in personal funds to the trust account, problems evidently continued with the account, and the bank charged Mr. Ahaghotu for having insufficient funds to cover two checks in September 2005. As the Board noted, "[r]espondent was unable to provide records or to identify for Bar Counsel the checks that resulted in these two charges," and Bar Counsel did not allege misappropriation for these incidents either.

7. The Hearing Committee credited Mr. Ahaghotu's "testimony of inattention" and his other explanations of his actions, and the Board for the most part adopted these findings.

ceiving entrusted funds to cover medical expenses for a client.

Acknowledging that Mr. Ahaghotu's actions were not as egregious as those of other lawyers this court has disbarred for reckless misappropriation, the Board nevertheless determined that his "casual indifference in maintaining the security of his fiduciary funds [was] beyond negligence." According to the Board,

> Respondent was clearly on notice of problems with his accounting practices and his escrow account, which he failed to address: (1) he had been disciplined twice based on the failure to promptly pay his clients' health providers ... (2) he knew that five checks to health care providers were returned for insufficient funds in June 2004, but failed to determine the cause of the shortfall ... and (3) his deposit of $19,707 of his personal money to stabilize the escrow account in early June 2004, which dwindled to $4,447.18 by July 2004, indicated a continued escrow accounting problem.

The Board split from the Hearing Committee in characterizing Mr. Ahaghotu's reaction to the overdrafts in June 2004 and his overall handling of his trust account. The Hearing Committee compared Mr. Ahaghotu's actions to those of the respondents in *Anderson, supra* and *In re Smith,* 817 A.2d 196 (D.C.2003), two cases where lawyers misappropriated client funds due in part to inadequate accounting and recordkeeping but only one of which (*Smith*) resulted in disbarment for recklessness. The Committee concluded that Mr. Ahaghotu's actions were closer to Mr. Anderson's negligent misappropriation; Mr. Anderson, as the Committee summarized it, "maintained no separate trust or escrow account, kept records by making notations on case files and storing records of payments 'in his head,' and failed to pay one service provider for over a year during which the account balance fell below the amount due the provider." The Committee thought Mr. Ahaghotu was in some respects less culpable even than Anderson, pointing out that "in this case Dr. Onyewu acceded to a delay in payment and never asked Respondent for it," that Mr. Ahaghotu "had an inadequate documentation/accounting system, but better than Anderson's 'makeshift' system," and that "at least Respondent had a trust account, which Anderson did not." Ultimately, the Hearing Committee thought:

> The question whether the misappropriation was negligent or reckless is a close one, particularly given Respondent's decision to remedy the 2004 overdrafts by placing personal funds in the trust account, rather than determining the cause of the overdrafts. In considering all of the facts of this case, however, including that Respondent is 80 years old and appears to have somewhat diminished faculties [8] ... we conclude that Respondent's failure to determine the cause of the 2004 overdrafts does not reveal a "conscious indifference to the consequences of his behavior for the security of the funds." *Anderson,* 778 A.2d at 339.

Although, as the Hearing Committee noted, "the usual sanction for negligent misappropriation is a six-month suspension, *In re Kline,* 11 A.3d 261, 265 (D.C. 2011)," Mr. Ahaghotu had additional rule violations and prior discipline. The Committee thus recommended that he be suspended for one year. Because his age,

---

**8.** In addition to noting Mr. Ahaghotu's age, the Hearing Committee found that his testimony "revealed him to be very hard of hearing, confused at times, and unable to follow questions." His testimony, moreover, "evidenced an inattention to detail that was consistent with his demeanor at the hearing."

competency at the hearing, and inattention to the trust account "'cast[ ] a serious doubt upon [the Respondent's] continuing fitness to practice law[,]' *see In re White*, 11 A.3d 1226, 1233 (D.C.2011)," the Committee recommended that "as a condition of reinstatement, he establish his fitness to practice law pursuant to D.C. Bar R. XI, § 16."

## II.  Analysis

■ We accept the Board's findings of fact, which are supported by substantial evidence in the record. *See Smith*, 817 A.2d at 201 (citation omitted). The primary dispute here is over "'whether any misappropriation resulted from more than simple negligence,'" which is a question of law "'concerning ultimate facts,' and [is] reviewed by this court *de novo*." *Hewett*, 11 A.3d at 284–85 (quoting *In re Berryman*, 764 A.2d 760, 766 (D.C.2000)) (internal quotation marks omitted). We also examine respondent's claim that even if we were to find he acted recklessly, it would be "unjust and harsh to disbar him." We ultimately reject all of Mr. Ahaghotu's arguments and adopt the Board's recommendation.

## A.  Reckless or Negligent Misappropriation

■ Misappropriation happens "when the balance in [the attorney's] trust account falls below the amount due the client," *In re Moore*, 704 A.2d 1187, 1191 (D.C.1997), whether or not the attorney "derives any personal gain or benefit" by misusing the money, *In re Pleshaw*, 2 A.3d 169, 173 (D.C.2010) (internal quotation marks and footnote omitted). The severity of the sanction for misappropriation depends on whether the misappropriation was (1) intentional or reckless, or (2) merely negligent. *Anderson*, 778 A.2d at 338.

■ In *Anderson*, this court stated that:

The central issue in determining whether a misappropriation is reckless is *how* the attorney handles entrusted funds, whether in a way that suggests the unauthorized use was inadvertent or the result of simple negligence, or in a way that reveals either an intent to treat the funds as the attorney's own or a conscious indifference to the consequences of his behavior for the security of the funds.

*Id.* at 339 (citing *Micheel*, 610 A.2d at 236). Reckless misappropriation "reveal[s] an unacceptable disregard for the safety and welfare of entrusted funds," and its "hallmarks" include: "the indiscriminate commingling of entrusted and personal funds"; a "complete failure to track settlement proceeds"; the "total disregard of the status of accounts into which entrusted funds were placed, resulting in a repeated overdraft condition"; "the indiscriminate movement of monies between accounts"; and finally "the disregard of inquiries concerning the status of funds." *Id.* at 338 (citations omitted). In *Anderson*, we also said that "our decisions, by clear implication, have rejected the proposition that recklessness can be shown by inadequate record-keeping alone combined with commingling and misappropriation." *Id.* at 340.

Mr. Ahaghotu argues that his conduct was not "egregious" enough to constitute reckless misappropriation because his case does not include such factors as "testifying falsely, forgery of documents, [and] willful refusal to do a mandated act." He would like us to disregard the Board's Report and Recommendation in favor of the Hearing Committee's, claiming that because the Committee actually saw him testify, it was in a better position than the Board to decide if he acted with the "conscious indifference" identified in *Anderson*. He cites no cases for these propositions, however, and we can find none. Instead, as

*Anderson* noted, we find in our cases a focus on "*how* the attorney handle[d] entrusted funds." *Id.* at 339.

We conclude that Mr. Ahaghotu did not handle his clients' funds in a way that protected them from obvious danger. His accounting troubles in June 2004—the five checks that bounced without explanation—may have been merely the result of inadvertence and poor recordkeeping. But that is not the incident we are examining. Our inquiry is whether the misappropriation in July 2005 was the result of negligence or recklessness, and we cannot ignore that Mr. Ahaghotu had been on notice for more than a year that either his internal accounting practices were lacking or that his bank was somehow mishandling the account. His commingling of funds only papered over the problem and, unfortunately, showed a continued lack of interest in tracking what client funds were available at any given moment. When he injected personal funds to make up for a low trust account balance, instead of sitting down with the bank to figure out what went wrong, it was likely something would go wrong again. *See In re Ross,* 658 A.2d 209, 211 (D.C.1995) ("[T]he purpose of the rule against commingling was not only to prevent the more serious offense of misappropriation, but also to avoid the possibility of unintentional loss of a client's funds due to circumstances beyond the control of the attorney." (citation omitted)). Thus, this case is not one of "inadequate record-keeping alone." *Anderson,* 778 A.2d at 340.

Although many of the *Anderson* "hallmarks" are not unequivocally present in the misappropriation at issue in Mr. Ahaghotu's case,[9] the violation happened because he ignored the warnings of previous overdrafts and commingling. He certainly was "indiscriminate" in the way he thought of the money in his trust account—disbursing funds without regard to how they matched up with previous deposits—and his inability to explain the overdrafts demonstrates a significant, though perhaps not "complete," failure to track which deposited funds were being paid to which recipients. For a lawyer to simply stand by, as Mr. Ahaghotu did, after his trust account had dwindled to nothing (even though, by his telling, he was continuously making deposits) shows a conscious disregard of "the risk that those funds would be used for unauthorized purposes." *Anderson,* 778 A.2d at 339. Although he attempted to find out what went wrong, he was unsuccessful, and while he believed the bank had failed to process some deposits he made, he evidently did not bring these uncredited checks to the bank's attention and rectify the situation or close the account and start over with a new bank. *Cf. Kline,* 11 A.3d at 264 (holding that respondent's misappropriation after a computer crash destroyed his trust account records was negligent where his "relative inaction" following the crash included an unsuccessful attempt to recover the information and establishment of a new trust account at a different bank).

9. As the Hearing Committee pointed out: Mr. Ahaghotu made two deposits resulting in commingling but did it "to cover overdrafts [and] there was no evidence that he used the trust account for personal or firm expenses"; he at least nominally tracked disbursements in Ms. Adams's case on a sheet showing how settlement proceeds would be split; he did not "total[ly] disregard" the status of his accounts, using a "double carbon check" system and cursorily reviewing bank statements; his account was more than once in a "repeated overdraft condition," but the misappropriation at issue here did not involve overdrafts; except for the June 2004 deposit of $7000, he did not move money between his accounts, so there was no "indiscriminate movement"; and Dr. Onyewu never made inquiries about the status of his fee in Ms. Adams's case.

■ Mr. Ahaghotu's case is similar to *Smith*, where the respondent knew he owed a client $1947.89, checked his account balance almost daily and thus was aware that for many weeks he did not have sufficient funds to pay his client, and yet took no action to safeguard these entrusted funds. 817 A.2d at 198–200. The court concluded that "[r]espondent's conduct while he was conscious of the account's deficiencies was so persistent ... that we cannot gainsay the Board's determination that his misappropriation was reckless, not merely negligent." *Id.* at 203. Mr. Ahaghotu similarly was aware of frequently having inadequate funds—either because the bank was mishandling his account or he was—and yet he did nothing to protect his clients from future misappropriation, consciously continuing to treat his trust account as a pool of unidentified money. When the misappropriation eventually happened, it was exactly the result risked by his conscious failure to act and his conscious disregard of the rule against commingling.[10] *See Pleshaw*, 2 A.3d at 173–74 ("[Respondent] thus demonstrated that he was aware of and understood the conservatorship rules, but he nonetheless disregarded them for his own convenience. This alone constitutes 'conscious indifference.'" (citation omitted)). We therefore agree with the Board's determination that there is clear and convincing evidence of Mr. Ahaghotu's reckless misappropriation.

## B. Sanction

■■ As a panel of this court, we cannot revisit our en banc decision in *Addams*

holding that "in virtually all cases of misappropriation, disbarment will be the only appropriate action unless it appears that the misconduct resulted from nothing more than simple negligence," *In re Fair*, 780 A.2d 1106, 1109 (D.C.2001) (quoting *Addams*, 579 A.2d at 191). *See M.A.P. v. Ryan*, 285 A.2d 310 (D.C.1971). Citing a continuing current of discontent with that rule,[11] Mr. Ahaghotu nonetheless argues that "it would be unjust and harsh to disbar him, when one can best characterize his 'recklessness' as being 'benign' rather than 'indifferent' or 'egregious.'"

■ In *Hewett*, this court for the first time since *Addams* determined that circumstances "extraordinary" enough existed to warrant a lesser sanction for an attorney who intentionally misappropriated client funds. 11 A.3d at 281, 286 ("[W]here a lawyer has engaged in intentional misappropriation of funds, a sanction less than disbarment may be appropriate 'in extraordinary circumstances.'" (quoting *Addams*, 579 A.2d at 191)). We agree with the Board that there are no extraordinary circumstances here. Mr. Ahaghotu's misappropriation does not align with the facts of *Hewett*, where the respondent served as an appointed conservator for an elderly ward of the court and his misappropriation involved deducting an attorney's fee (to which he believed he was entitled) only as a last resort to pay down his ward's assets and maintain the ward's Medicaid eligibility. *Id.* at 281–83.

While no one was harmed by Mr. Ahaghotu's July 2005 misappropriation, that

---

10. We disagree with the Hearing Committee that Mr. Ahaghotu's age and apparent hearing loss and confusion at the time of his testimony affect whether his misappropriation was reckless or negligent. Mr. Ahaghotu's hearing took place in March 2011, more than five years after the misappropriation at issue and

more than six years after the overdrafts. No evidence was placed in the record that the events at issue were the result of Mr. Ahaghotu's age or diminishing faculties.

11. *See, e.g., In re Bach*, 966 A.2d 350, 353–57 (D.C.2009) (Ferren, J., concurring).

appears to be only because Dr. Onyewu, as a close acquaintance, had deferred his fee and was in no rush to receive it. Mr. Ahaghotu has not alleged that his age or diminishing faculties are mitigating circumstances, and at any rate we cannot conclude that any mitigating factors here outweigh the effect of his prior discipline. *See Addams,* 579 A.2d at 191 ("[A]s a matter of course, the mitigating factors of the usual sort will suffice to overcome the presumption of disbarment only if they are especially strong and, where there are aggravating factors, they substantially outweigh any aggravating factors as well." (internal citation omitted)).

Accordingly, it is ORDERED that respondent shall be, and hereby is, disbarred from the practice of law in the District of Columbia. For purposes of reinstatement, the period of respondent's disbarment will not begin to run until such time as he files an affidavit that fully complies with D.C. Bar R. XI, § 14(g). *See* D.C. Bar R. XI, § 16(c).