*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

No. 18-BG-818

IN RE: BERNARD A. GRAY, SR., RESPONDENT

A Member of the Bar of the
District of Columbia Court of Appeals
(Bar Registration No. 955013)

On Report and Recommendation of the
Board on Professional Responsibility
(BDN-349-15)

(Argued October 22, 2019      Decided February 13, 2020)

*Traci M. Tait*, Assistant Disciplinary Counsel, with whom *Hamilton P. Fox, III*, Disciplinary Counsel, was on the brief, for petitioner.

*John W. Nields, Jr.*, for respondent.

Before FISHER and BECKWITH, *Associate Judges*, and WEISBERG, *Senior Judge, Superior Court of the District of Columbia.**

PER CURIAM: This disciplinary matter requires us to decide, once again, whether an attorney's misappropriation of client funds was "reckless," triggering the virtually automatic sanction of disbarment under the holding of *In re Addams*,

---

\* Sitting by designation pursuant to D.C. Code § 11-707(a) (2012 Repl.).

579 A.2d 190, 191 (D.C. 1990) (*en banc*), or whether instead it resulted from "simple negligence," which would allow for the imposition of a lesser sanction. An *Ad Hoc* Hearing Committee found that respondent's misappropriation of client funds was negligent and recommended that he be suspended for six months with reinstatement on certain conditions. The Board on Professional Responsibility accepted the Hearing Committee's findings of fact but disagreed with the finding of negligence, concluding that respondent had engaged in reckless misappropriation. Finding further that respondent had not presented "extraordinary circumstances" as would justify a departure from the sanction of disbarment otherwise mandated by *Addams*, 579 A.2d at 191, the Board recommended that respondent be disbarred.[1]

We agree with the Board that respondent's misappropriation of entrusted funds was reckless and that respondent has not presented extraordinary circumstances to justify a departure from the presumptive sanction of disbarment. Accordingly, we are bound by the *en banc* decision in *Addams* to order that respondent be disbarred.

---

[1] The Board members unanimously agreed that respondent's misappropriation was reckless, but in a separate statement four members expressed the view that the sanction of disbarment mandated by *Addams* was too harsh as applied to respondent.

**I.**

On July 7, 2016, the Office of Disciplinary Counsel filed a petition for discipline alleging that respondent had violated Rule 1.15(a) of the District of Columbia Rules of Professional Conduct by (1) misappropriation of client funds, (2) commingling of his own funds with entrusted client funds, and (3) failure to maintain complete records of entrusted client funds.[2]  On December 14, 2016, Disciplinary Counsel filed an amended petition, reiterating the original charges and adding another count alleging a violation of Rule 1.15(a) by commingling and misappropriation from a second client.  The respondent answered the petition by admitting that he commingled client entrusted funds with his own and that he failed to maintain adequate records of entrusted client funds, but denying that any misappropriation was intentional or reckless, asserting that there was a "mistaken removal of client funds from his trust account."

An *Ad Hoc* Hearing Committee conducted an evidentiary hearing and made detailed findings of fact, concluding that respondent's commingling of funds and

---

[2]  The petition contained a second count alleging a violation of Rule 8.4(d) in that he engaged in conduct that seriously interferes with the administration of justice.  The Hearing Committee and the Board did not sustain that count, and we do not consider it.

inadequate record keeping had led to negligent misappropriation. The Board, in turn, adopted the Hearing Committee's findings of fact as supported by substantial evidence in the record as a whole, but rejected the conclusion the Hearing Committee drew from those facts. The Board unanimously concluded that respondent's misappropriation was reckless and not simply negligent, with the majority of the members recommending disbarment.[3] We will set forth the facts found by the Board (and the Hearing Committee), mindful of our obligation to "accept the findings of fact made by the Board unless they are unsupported by substantial evidence of record." District of Columbia Bar Rule XI § 9(h) (2018).

Respondent has been a member of the bar since 1978. Throughout his career he has been a sole practitioner, working from his home office, without benefit of a support staff. The vast majority of his clients have been low and moderate income tenants and small landlords, primarily in the Landlord and Tenant Branch of Superior Court. He typically charged below market fees, and he often let his clients pay in installments, or not pay at all, when they could not meet their obligations under their fee agreements. As a result, much of his work ended up being without compensation. Respondent deposited his retainer fees into his trust account because he understood they were the property of the client until

---

[3] *See supra*, note 1.

earned. Because the fees were relatively small, they were usually earned before, or shortly after, he deposited them. Respondent's practice, however, was to leave the earned fees in the trust account until he needed to withdraw money for personal or professional expenses. On occasion respondent also deposited what he called pure client funds into the trust account, such as proceeds from the sale of property or from settlements or judgments he obtained on behalf of his clients.

From the time he began his practice, respondent understood his obligation to maintain client funds in a trust account and to keep them separate from his operating account and his own money, and he understood the reasons behind the prohibition against commingling. From all that appears in the record, for many years respondent was able to account for his entrusted client funds, and he maintained a computerized record of his trust account for that purpose. He admits, however, that beginning in 2007 he stopped tracking client funds in his trust account and his "record-keeping became haphazard and incomplete." He testified at the hearing that he allowed his accounting to lapse "because his practice became too busy and due to some health challenges." Respondent believed he had a "reasonably accurate understanding" of the amount of money in the trust account that belonged to him. Unfortunately, as will be shown, objective facts tell a different story. Indeed, it would have been nearly impossible for respondent to

know at any given time how much of the trust account belonged to him and how much to his clients, since respondent made frequent deposits of his money and client money (unearned fees) into the account and regularly withdrew money from the account, but from 2007 forward he made no attempt to reconcile his account balance against deposits he made or checks he wrote and rarely even looked at his monthly bank statements.

## A.     Walker Misappropriation

The misappropriations that are at issue in this case did not begin to surface until 2013.  In April of that year, respondent represented Alice Walker, the personal representative of a family estate, in connection with the sale of real property owned by the estate.  Respondent deposited the sale proceeds of $121,133.99 into his trust account, and made various disbursements pursuant to Ms. Walker's instructions.  One of the disbursements was a check for $986.25 to Anthony Thomas, which was never cashed.  After all of the distributions had been made, Ms. Walker instructed respondent to retain $10,000 in the account as a contingency against a possible claim by an attorney who had done work for the estate.  No such claim was ever made.  In addition to the $10,000 hold back, respondent was owed his fee of $15,373.99 from the proceeds of the sale of the property, which he left in the account until such time as he chose to withdraw it.

As of June 30, 2014, respondent's trust account contained $10,986.25 belonging to the estate represented by Ms. Walker, consisting of the $10,000 held for a possible claim by the former attorney and $986.25 still owed to Mr. Thomas because he had not cashed the original check. On that day, respondent withdrew the entire balance of $14,444.25 from the account at Sun Trust Bank and opened a new trust account at PNC Bank.[4]

Between July 1, 2014, and March of 2015, the balance in the PNC trust account had declined to $1,688.85. Thus, respondent had spent virtually all of the Walker money that had been entrusted to him. He had apparently forgotten that $10,986.25 that had been in the account did not belong to him. This misappropriation did not come to light until July of 2016 during Disciplinary Counsel's investigation of a separate misappropriation, when respondent and his attorney discovered it as they were attempting to reconstruct the bank records and brought it to the attention of Disciplinary Counsel. Because the trust account did not have sufficient funds to repay the Walker money, respondent paid Ms. Walker

---

[4] When respondent closed the Sun Trust account, he failed to notice that a $500 check he had previously written to himself from that account had not yet cleared. When that check was presented for payment later that same day, the account was closed and Sun Trust dishonored it. The record is unclear when, if ever, respondent became aware that the check had bounced. Had respondent been paying attention, it would have put him on notice that his "haphazard record-keeping" was not working.

$10,000 from his personal funds and issued a new check to Mr. Thomas for $986.25 from the trust account.

## B. Artis Misappropriation

In 2015 respondent represented another client, Stephanie Artis, in a civil action for damages against her landlord and a suit by her landlord against her for possession of her apartment based on nonpayment of rent. In the civil action, Ms. Artis recovered a judgment against her landlord for $8,381.49, which the landlord paid with two checks in March and April of 2015. Respondent deposited the money into his trust account, except for $500 he paid out to Ms. Artis at her request. Subsequently, the landlord's suit for possession was settled with Ms. Artis agreeing to pay her landlord $3,848 in back rent. Ms. Artis instructed respondent to pay that amount from the funds he was holding in trust from the civil judgment. On October 21, 2015, respondent wrote a check from the trust account to the landlord in the amount of $3,848. At that time, the trust had a balance of $9,295.85, sufficient to cover the check to the landlord, but insufficient to cover the funds respondent was still holding in trust for Ms. Walker and Mr. Thomas.

On October 29, 2015, respondent checked the balance of the trust account and learned that it was more than $9,000. Oblivious to the fact that all of that

money, and then some, belonged to Ms. Walker and Mr. Thomas, and without noticing that the $3,848 check to Ms. Artis' landlord had not yet cleared, respondent withdrew $9,000 from the account for his personal use. When the landlord's check was presented for payment the following day, PNC Bank dishonored it based on insufficient funds.[5]

Respondent did not tell Ms. Artis that the check to her landlord had bounced, and he promptly wrote another check for $3,848 to the landlord from another account. The landlord refused to accept the substitute check because it was past the deadline in the settlement agreement. Again without informing Ms. Artis, respondent went to court on her behalf and convinced the judge to enforce the agreement by ordering the landlord to accept the late payment. In November 2015, after deducting his agreed upon fee, respondent paid Ms. Artis the balance of the civil judgment proceeds he was supposedly holding for her in his trust account. However, since the trust account lacked sufficient funds to cover that payment, respondent wrote her a check from another account, annotating the check with the words "From Trust…" Respondent did not inform Ms. Artis of these events or that her settlement had been in jeopardy because of the late payment to her landlord

---

[5] This overdraft and the Bank's notice to Disciplinary Counsel triggered the investigation, resulting in the original petition for discipline in July of 2016.

until shortly before the disciplinary hearing in January 2017, more than a year later.

The Hearing Committee, and the Board, credited respondent's testimony that he "believed [he] had a reasonably accurate understanding of what was in [his] trust account," and he believed he had earned (and therefore owned) any funds he withdrew from the trust account for his own use. Respondent's belief notwithstanding, it is apparent that his assessment of whose money was in the account was not accurate and his misunderstanding led him to misappropriate money held in trust for two clients. The Hearing Committee found those misappropriations to be the result of simple negligence. The Board, on the other hand, characterized respondent's conduct as reckless, and Disciplinary Counsel urges us to find likewise. The determination of whether respondent's conduct falls on the negligent or the reckless side of the culpability line is consequential. If the misappropriation resulted from conduct that was more than simply negligent, under our precedents respondent must be disbarred.

## II.

We begin with a restatement of familiar principles that guide our analysis. Disciplinary Counsel bears the burden of proving intentional or reckless

misappropriation—i.e. more than "simple negligence"—by clear and convincing evidence. *In re Anderson*, 778 A.2d 330, 335, 337 (D.C. 2001). The Board found, unanimously, that Disciplinary Counsel had met its burden of proving reckless misappropriation in this case. "[T]he Court shall accept the findings of fact made by the Board unless they are unsupported by substantial evidence of record, and the Court shall adopt the recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted." D.C. Bar Rule XI § 9(h); *see In re Kanu*, 5 A.3d 1, 14 (D.C. 2010); *In re Berryman*, 764 A.2d 760, 766 (D.C. 2000). Similarly, the Board must accept the Hearing Committee's findings of fact and defer to its credibility determinations if they are supported by substantial evidence in the record, viewed as a whole. D.C. Bar Rule XI § 9(h); *In re Speights*, 173 A.3d 96, 99 (D.C. 2017); *In re Micheel*, 610 A.2d 231, 234 (D.C. 1992). The Hearing Committee in this case determined that respondent's misappropriation was negligent, but not reckless. As to that determination of ultimate fact—really a conclusion of law—the Board owed the Hearing Committee no deference. *Micheel*, 610 A.2d at 234-35. The Board rejected the Hearing Committee's finding of negligence and concluded that respondent's misappropriation was reckless. In our review of the Board's decision, since the question of whether respondent's misappropriation resulted from more than simple negligence is a question of law

concerning ultimate facts, we do not defer to the Board's conclusion on that question and our review is *de novo*. *In re Abbey*, 169 A.3d 865, 872 (D.C. 2017); *In re Ahaghotu*, 75 A.3d 251, 253 (D.C. 2013); *Anderson*, 778 A.2d at 339 n.5.

We conclude that the evidence in this record demonstrates clearly and convincingly that respondent's misappropriation of entrusted funds from two clients went beyond simple negligence and was therefore reckless. We reach that conclusion fully mindful of the sanction of disbarment that must follow from it, and we recognize the harshness of that sanction as applied to sole practitioners such as this respondent, whose misappropriation did not involve dishonesty.

Misappropriation occurs when the balance of an attorney's trust account falls below the amount of the client's funds held in trust. *Abbey*, 169 A.3d at 872 (quoting *Ahaghotu*, 75 A.3d at 251). It includes any unauthorized use of a client's entrusted funds and does not require dishonesty or proof of a larcenous intent; even temporary unauthorized use for the lawyer's own purposes is misappropriation, whether or not the lawyer derives any personal gain or benefit. *Anderson*, 778 A.2d at 335. It does not matter that the lawyer has sufficient funds on hand to pay the money back, or even whether the lawyer replenishes the trust account with his own funds without the client finding out that the money was missing. *See In re Pels*, 653 A.2d 388, 393–94 (D.C. 1995). As it relates to the sanction of

disbarment under *Addams*, the decision is binary: either a misappropriation results from mere negligence (no automatic disbarment), or from a higher degree of culpability, including both intentional and reckless misappropriation (virtually automatic disbarment). *Anderson*, 778 A.2d at 338.

Reckless misappropriation reflects "an unacceptable level of disregard for the safety and welfare of entrusted funds," essentially manifesting a "conscious indifference to the consequences of [the attorney's] behavior for the security of the [client's] funds." *Ahaghotu*, 75 A.3d at 253 (quoting *Anderson*, 778 A.2d at 336, 339). Proof of commingling and inadequate record keeping standing alone will ordinarily not be sufficient to prove reckless misappropriation. *Anderson*, 778 A.2d at 340. There must be something more before a misappropriation will cross the line between simple negligence and recklessness.

Here, respondent certainly commingled his own funds with money entrusted to him by his clients and, at least as of 2007, engaged in grossly inadequate record keeping. But we also find on this record much more conduct indicative of recklessness. To begin with, based on his own testimony at the hearing, respondent knew he was required to hold his clients' entrusted funds in a trust account and to keep them separate from his own. Furthermore, he understood that the reason for the requirement is to make absolutely sure that the client's money

would be untouchable until the balance owed to the client comes due. Respondent also knew that his retainer fees were the property of the client until earned and knew that as fees were earned they became his property and should not be commingled with entrusted client funds. Yet he nonetheless commingled his money with his clients' money in a single trust account, not removing his fees as they were earned and instead taking money out of the commingled account whenever he needed it.

For all we know from this record, respondent's accounting practices appear to have worked reasonably well for him and for his clients for many years. Starting in 2007, however, respondent's ability to account for his clients' entrusted funds—flawed from the beginning—became hazardous, and respondent consciously ignored the hazard at his peril. Knowing that the whole purpose of maintaining a trust account was to keep the clients' money safe and secure, respondent essentially stopped monitoring in any meaningful way the status of his trust account. He continued to deposit earned and unearned fees into the account and to withdraw money from the account as needed, not differentiating between funds that belonged to him and those that belonged to his clients. If he kept records, he did not rely on them. He admitted that he rarely, if ever, looked at his monthly bank statements and made no attempt to reconcile his account balance

with deposits he had made or checks he had written.

In 2013 respondent sold the property for his client Ms. Walker and deposited more than $120,000 into the trust account. Except for respondent's fee of approximately $15,000, all of the money belonged to the estate for which Ms. Walker served as personal representative. At Ms. Walker's direction, respondent made numerous disbursements to beneficiaries and creditors of the estate, including the check for $986.25 to Mr. Thomas, which was never cashed, although respondent failed to account for it. Worse still, within the next year respondent simply forgot that he was still holding $10,000 of the Walker money in trust for the estate in the event a former attorney for the estate made a claim. Because he retained no record of that money belonging to the estate, respondent continued to spend it as if it were his own. Whenever the balance of the trust account dipped below $10,986.25, which it did almost every month in 2015, respondent was misappropriating his client's money. If Ms. Walker had asked respondent to send her the $10,000 he was holding for her, the trust account lacked sufficient funds to pay it. It does not matter that Ms. Walker never asked or that, had she asked, respondent could have paid her from other assets. Neither circumstance is a defense to misappropriation. *See Pels*, 653 A.2d at 394 ("restitution is not a defense to the charge of having misappropriated trust funds"). Given respondent's

utter failure to monitor the money going into and out of his trust account over a period of eight years, his good faith but erroneous belief that the money he was spending was his own reflected an unacceptable disregard for the safety of entrusted funds and a conscious indifference to the consequences of ignoring his fiduciary obligation to protect his client's money; and it certainly does not make his conduct less reckless that his good faith belief was based on his having forgotten he was holding more than $10,000 of his client's money in the first place.

Respondent's misappropriation of the Walker money went unnoticed throughout 2015. It might never have been discovered had it not been for respondent's misappropriation of money he held in trust for a second client in October of 2015, which gave rise to Disciplinary Counsel's investigation. This occurred when respondent removed $9,000 from the trust account for his own use on October 29, 2015, without realizing that a $3,848 check he had written to Stephanie Artis' landlord from funds she had entrusted to him in April 2015 had not yet cleared.[6] When the check was presented for payment the next day, the

---

[6] Even before respondent removed the $9,000, the trust account balance of approximately $9,700 included a loan or gift of $5,500 respondent's son had mistakenly deposited into the trust account rather than another of respondent's accounts. Without that money, which should not have been in the trust account, the account balance would have been approximately $4,200, not nearly enough to cover the money held in trust for Ms. Walker ($10,986) and Ms. Artis ($7,881.49).

account was overdrawn and the check was dishonored, placing Ms. Artis' settlement with her landlord in jeopardy.

In reality, respondent had misappropriated the Artis funds even before he withdrew the $9,000 from the account, because the account did not have enough to cover both the entrusted funds of Ms. Walker and Ms. Artis at any time in 2015. The $9,000 withdrawal and the dishonored check merely brought the Artis misappropriation to light. Even then, respondent did not identify the loss of the $10,986.25 belonging to Ms. Walker (and Mr. Thomas) until more than a year later, after he engaged counsel and, with the aid of an accountant, was able to reconstruct most of the account transactions.

When respondent discovered that the check to Ms. Artis' landlord had bounced, he replaced it with a check drawn on his own funds and, after the landlord declined to accept the late payment and attempted to back out of the settlement, respondent went to court and was able to salvage the settlement, all without telling Ms. Artis. However, the fact that Ms. Artis ultimately suffered no loss does not make respondent's unauthorized use of her money any less of a misappropriation; and, because it resulted from respondent's "unacceptable disregard for the safety and welfare of entrusted funds," *Anderson*, 778 A.2d at 338, the misappropriation was reckless.

Respondent does not deny that he misappropriated money from two clients, but he maintains that he had a good faith belief that the money he was spending was his own, and he was not "on notice" that his mishandling of his trust account had resulted in misappropriations until the October 30, 2015, overdraft. From this premise he argues that he was not "consciously indifferent" to the security of his clients' entrusted funds because he did not become aware of the problem until the October 2015 overdraft and took steps to correct it immediately.

There are a number of problems with respondent's position, which the Board considered and rejected. First, although repeated writing of checks against insufficient funds in a commingled account is one of the hallmarks of reckless misappropriation we identified in *Anderson*, 778 A.2d at 338, and was a factor we relied on to find recklessness in *Micheel*, 610 A.2d at 236, we have never insisted on such "notice" as a *sina qua non* of reckless misappropriation. Indeed, the five hallmarks of reckless misappropriation discussed in *Anderson* are neither intended to be an exhaustive list of relevant factors, nor must all of them be present before conduct resulting in misappropriation can be considered reckless. In *Ahaghotu*, for example, we found the attorney to have misappropriated entrusted client funds recklessly based on three of the five *Anderson* hallmarks. 75 A.3d at 257. Similarly, in *Pels* we discussed only three of the five hallmarks in finding the

attorney responsible for reckless misappropriation. 653 A.2d at 395-96. And in *In re Pleshaw*, 2 A.3d 169, 173-74 (D.C. 2010), an attorney who withdrew his fees from a conservatorship account on two occasions without prior court approval (one of which was approved after the fact and the other of which was denied without the attorney's knowledge) was disbarred for reckless misappropriation with no discussion of the *Anderson* hallmarks.

These cases and others illustrate that no one factor is dispositive and that each case must be considered on its own facts. Here, while several of the *Anderson* hallmarks are in fact present (indiscriminate commingling, complete failure to track settlement proceeds, total disregard of the status of accounts holding entrusted funds), what sets this case apart from those involving simple negligence is respondent's knowledge of his obligation to segregate and meticulously protect client funds and his knowledge that from 2007 until the bottom finally fell out in 2015 he was consciously ignoring that fiduciary obligation. Even though he did not receive actual notice that he had bounced a check that was supposed to be paid out of entrusted client funds until October 2015, he had been inadvertently spending his clients' money for an entire year before that check was dishonored.

Second, we have never held that an attorney's assertion of a good faith belief

that he was using his own money will preclude a finding of reckless misappropriation where that belief was objectively unreasonable. In *Anderson*, for example, we cited with approval the following definition from 57 Am. Jur. 2d Negligence § 302 (1989): "Reckless misconduct requires a conscious choice of a course of action, either with knowledge of the danger to others involved in it or with knowledge of facts that would disclose this danger to any reasonable person." 778 A.2d at 339. We have sustained a finding of negligent misappropriation where we found that the attorney's good faith belief in his or her entitlement to the misappropriated funds was objectively reasonable. *See, e.g.*, *In re Chang*, 694 A.2d 877, 880–82 (D.C. 1997). But we have also declined to hold that an attorney's good faith belief was sufficient to reduce reckless misappropriation to mere negligence, where the facts demonstrated that such a belief, even if honestly held, was not reasonable. *See, e.g.*, *Abbey*, 169 A.3d at 875; *In re Pierson*, 690 A.2d 941, 949 (D.C. 1997); *Pels*, 653 A.2d at 397.

Third, the only reason respondent could credibly claim that he believed in good faith that the money he withdrew from the trust account was his own money, and that the bounced check to Ms. Artis' landlord was his first notice to the contrary, is that he did none of the things required of him as a fiduciary to safeguard client funds held in escrow, any one of which would have put him on

notice that he had already misappropriated his clients' money or was in imminent danger of doing so. It was initially proper for respondent to put unearned retainer fees in his trust account together with other money entrusted by his clients, but it was not proper to leave those fees in the trust account and not transfer them to an operating account as they were earned. The resulting commingling of his money with his clients' money was itself a violation of Rule 1.15(a) of the Rules of Professional Conduct. Even though he knew he had stopped monitoring the trust account after 2007, he continued to withdraw money whenever he needed it, believing it to be his, but making no effort to ensure that it was not his clients'. In 2014, when he closed his trust account at Sun Trust Bank and moved it to PNC, he was apparently unaware that a $500 check he had written to himself from the Sun Trust account had not yet cleared and that Sun Trust dishonored the check when it was presented later that same day. He was unaware that the check for $986.25 to Mr. Thomas from the Walker estate had never been cashed and should have still been in the account. He totally lost track of the $10,000 Ms. Walker had asked him to keep in the account for a possible future claim by the estate's former lawyer, so that respondent was spending his client's money throughout 2015 when the account balance was continuously below that amount. When he checked the account balance on October 29, 2015, before withdrawing $9,000 for his own use, he not only failed to notice that the check to Ms. Artis' landlord had not yet

cleared, but he was also apparently unaware that $5,500 of the balance was attributable to a loan or gift that his son had mistakenly deposited into the trust account on May 4, 2015, and should have been in one of respondent's other accounts. Without that $5,500, the balance of the trust account on October 29 would have been insufficient to pay Ms. Artis and her landlord, with nothing left over to pay Ms. Walker, even before respondent withdrew any money. Finally, even after respondent made good on the $3,848 owed to Ms. Artis' landlord, there was only a little more than $1,000 in the trust account for the remainder of 2015 and 2016, yet respondent was still unaware that he had spent $10,000 of the Walker money months before, and he did not discover that misappropriation until late in 2016 when he attempted to reconcile the trust account with the assistance of counsel in response to the disciplinary investigation. On this record, demonstrating an unacceptable disregard for the safety and welfare of entrusted funds, respondent's good faith, but mistaken, belief that the money he took out of the trust account belonged to him cannot transform respondent's reckless misappropriation into one that was merely negligent.

The Board rejected respondent's argument based on his good faith belief that he had earned the fees he spent out of the trust account, finding that respondent's asserted good faith belief was not objectively reasonable. Respondent accuses the

Board of improperly importing into the standard for reckless misappropriation the element of objective reasonableness, which in his view belongs exclusively in the realm of negligence. We disagree. As we have shown, the Board's insistence on objective reasonableness is a correct reading of our prior decisions that have articulated the line between negligent and reckless misappropriation. Moreover, we reject respondent's premise that in this context objective reasonableness belongs exclusively to the realm of negligence. While it is true that an attorney's good faith belief—mistaken, but objectively reasonable—will sometimes be enough to reduce a resulting misappropriation from reckless to merely negligent, it does not follow that a good faith belief—mistaken and objectively unreasonable— will never be enough for us to find the conduct that caused the misappropriation to have been reckless. Here, what makes respondent's belief objectively unreasonable is his knowledge of his duty to keep his clients' funds separate from his own and his unacceptable disregard, from 2007 forward, for the safety and welfare of entrusted funds manifesting a conscious indifference to the consequences of his conduct for the security of those funds. *See Anderson*, 778 A.2d at 338–39. This is the very essence of reckless misappropriation, respondent's good faith notwithstanding.

## III.

Having concluded that respondent recklessly misappropriated client funds entrusted to him, we are bound by the *en banc* decision in *Addams*:

> We now reaffirm that in virtually all cases of misappropriation, disbarment will be the only appropriate action unless it appears that the misconduct resulted from nothing more than simple negligence. While eschewing a per se rule, we adhere to the presumption laid down in our prior decisions and shall regard a lesser sanction as appropriate only in extraordinary circumstances.

579 A.2d at 191. The burden of proving extraordinary circumstances in mitigation is on the respondent. *Anderson*, 778 A.2d at 337–38. Respondent cites the fact that he is a sole practitioner with a modest practice, focused almost exclusively on low and moderate income clients in landlord and tenant matters. He charged those clients below market fees, allowing them to pay in installments or not pay at all, often working without compensation. He points out that no client was ultimately harmed by his misappropriations, that he went to court to save Ms. Artis' settlement agreement, and that he fully reimbursed both Ms. Artis and Ms. Walker from his own money. Finally, respondent told the Board that he intends to retire from the practice of law. He does not object to a suspension, but he asks that, once reinstated, he be allowed to retire as a member of the bar.

Respondent's showing—while sympathetic and in many respects admirable—is not sufficient to rebut the presumption of disbarment. Since *Addams*, we have found extraordinary circumstances in only one case, where a court-appointed conservator withdrew his fee from his ward's account without prior court approval in order to benefit his ward by preserving his Medicaid eligibility. *In re Hewett*, 11 A.3d 279 (D.C. 2011). Respondent's showing does not meaningfully distinguish his case from others in which we have found similar circumstances insufficient to rebut the presumption of disbarment for reckless or intentional misappropriation. *See, e.g.*, *In re Thomas-Pinkney*, 840 A.2d 700, 701 (D.C. 2004) (no prior discipline, no dishonesty, "very considerable service to her community"); *Berryman*, 764 A.2d at 773 (small amount of money misappropriated, prompt repayment, no harm to client, inexperience of counsel, evidence of good character); *Pierson*, 690 A.2d at 949–50 (history of *pro bono* work, no prior discipline, cooperation with disciplinary investigation); *Pels*, 653 A.2d at 397–98 (small amount of money misappropriated, no harm to client, inexperience of counsel); *In re Robinson*, 583 A.2d 691, 692 (D.C. 1990) (small amount of money misappropriated, prompt repayment, no harm to client, no prior discipline, inexperience of counsel, evidence of good character).

In the present case, the Hearing Committee cited many of these same factors

in support of its finding that respondent's misappropriation resulted from negligence, not recklessness, a finding that the Board rejected, as do we. And, while four members of the Board lamented that disbarment must follow from the Board's unanimous finding of reckless misappropriation, those members did not disagree that respondent had failed to show extraordinary circumstances to overcome the *Addams* presumption of disbarment, urging only that this court should "expand consideration of what sanction is appropriate in a case like this." Board Report, Separate Statement of Four Members at p. 4. The Board majority did not share the sentiment that disbarment was excessive in light of respondent's reckless misappropriation. In any event, even if we were to agree with the four members in the minority, as a division of the court we are not free to modify the holding of *Addams*, which was itself an *en banc* decision. *See Thomas-Pinkney*, 840 A.2d at 701.

We appreciate that the sanction of disbarment may seem harsh as applied to sole practitioners like this respondent, who lack the resources to employ the kind of support staff more affluent lawyers rely on to steer them clear of bad accounting practices that can lead to unintentional misappropriation. This is particularly true where, as here, no one contends that respondent's conduct was dishonest, or even that it was motivated by avarice or a desperate need for money he knew was not

his to take.  He simply took his eye off the ball, but he did so over many years, involving thousands of dollars of entrusted funds, knowing that he was ignoring his fiduciary duty to keep track of those funds and to keep them secure.  He now finds himself facing disbarment at the twilight of a long career of providing much needed legal services to an underserved population of low and moderate income residents of our community.

Nonetheless, respondent's clients had a right to expect from their lawyer the same degree of vigilance in protecting their entrusted funds that any client, rich or poor, would expect when they hand their money over to their lawyer for safekeeping.  The rule of *Addams*—while inflexible and sometimes harsh—is designed to protect all clients, to enhance public trust and confidence in the integrity and trustworthiness of all lawyers, and to deter the kind of misconduct we see all too often in this case and others like it.  *See Pels*, 653 A.2d at 398 (quoting *Addams*, 579 A.2d at 198).  Given those purposes, exercise of discretion to impose lesser sanctions in cases of intentional or reckless misappropriation with sympathetic facts would come at a steep cost.  It would promote inconsistent decisions and confuse the guidance it is our duty to provide to the bar, and it would dilute the strength of the rule and weaken its deterrence, risking a further erosion of public trust and confidence in the legal profession.  Those steps should not be

undertaken lightly, and this case does not present a suitable occasion for starting down that path.

Accordingly, it is ORDERED that Bernard A. Gray, Sr. be, and hereby is, disbarred from the practice of law in the District of Columbia. For purposes of reinstatement, the period of respondent's disbarment shall not begin to run until such time as he files an affidavit in compliance with D.C. Bar R. XI § 14(g). *See* D.C. Bar R. XI § 16(c).

*So ordered.*